S01P0977. YATES v. THE STATE.
(553 SE2d 563)

BENHAM, Justice.

John Thomas Yates was convicted of malice murder, burglary, and aggravated assault. The jury recommended the death penalty for the murder after finding beyond a reasonable doubt that the murder

was committed while Yates was engaged in the commission of a burglary. OCGA § 17-10-30 (b) (2). The trial court sentenced Yates to death and he appeals. Because potential jurors were improperly excused from jury service, we reverse the convictions and sentences.[1]

1. The evidence adduced at trial authorized the jury to find the following as facts. Yates had an on-again/off-again relationship with Kemylene Thompson. They had dated periodically for four years and had a baby in 1996, but they were not in a relationship with each other in April 1998. In the early morning hours of April 12, 1998, Thompson met Miller Crafter at a party at the local American Legion hall. Yates was also at the party and had an argument with Thompson about the provocative way she was dancing. At about 2:00 a.m., Thompson and Crafter went to her apartment and, after Thompson locked the front and bedroom doors, had sex. No one else was home.

About an hour after entering the apartment, Crafter heard a knock on the bedroom door. Yates then kicked in the door and said to Thompson, "[B]itch, you gonna die tonight." In the dim light of the bedroom it appeared to Crafter that Yates was hitting Thompson with his fist. Thompson screamed, "[Y]ou're hurting me, get out of here, you [are not] supposed to be in here." Then she collapsed and Yates turned to Crafter and said, "[Y]ou gonna die too." Crafter realized that Yates had a knife when he was stabbed in the back and side during the ensuing struggle. Crafter managed to restrain Yates until the arrival of a police officer who had been summoned by neighbors. The officer had to kick in the locked front door in order to gain entry; the police later discovered that Yates had entered the apartment through a window after propping it open with a stick. The knife was recovered from the bedroom floor. After he was handcuffed, Crafter told Yates that he had killed Thompson and Yates replied, "[S]o what." When Yates arrived at the jail, he yelled to the other inmates, "[T]hey got me this time, they got me for murder one, I killed the bitch, and if she ain't dead, I hope she goes to hell."

The medical examiner testified that Thompson was stabbed ten times in the chest, left arm, abdomen, finger and left thigh. The fatal

---

[1] The victim was killed on April 12, 1998, and the Upson County Grand Jury indicted Yates for malice murder, felony murder, burglary and aggravated assault on May 14, 1998. The State filed its notice of intent to seek the death penalty on May 19, 1998. The trial began on April 26, 1999, and the jury convicted Yates of malice murder, burglary, and aggravated assault on May 4, 1999. The jury acquitted Yates of felony murder. The jury recommended a death sentence for the murder on May 5, 1999, and, in addition to the death sentence, the trial court sentenced Yates to 20 years in prison for burglary and 20 years for aggravated assault, all sentences to be served consecutively. Yates filed a motion for new trial on May 26, 1999, an amended motion for new trial on September 8, 2000, and a second amended motion for new trial on November 3, 2000. The motions were denied on January 3, 2001. Yates filed a notice of appeal on January 31, 2001, and this case was docketed in this Court on March 28, 2001. It was orally argued on July 9, 2001.

wound was a stab wound to the chest that cut the aorta, resulting in severe and rapid blood loss. According to the medical examiner, Thompson had probably lived only about one minute after this wound, which had been inflicted with such force that the knife left a wound track deeper than the length of the blade. At trial, Yates claimed that Crafter attacked him when he entered the bedroom and that he had accidentally stabbed Thompson while defending himself.

The evidence summarized above was sufficient to authorize a reasonable trier of fact to find Yates guilty beyond a reasonable doubt of malice murder, burglary, and aggravated assault. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to authorize the jury to find the statutory aggravating circumstance which supported his death sentence for the murder. Id.; OCGA § 17-10-35 (c) (2).

2. Yates filed a pretrial motion requesting that the trial court personally determine all excusals from jury service and that the defense be provided with "notice and opportunity to be heard on any application by a potential juror to be excused" from jury service. The trial court granted the motion and ruled at a motion hearing that the procedure to be followed in this case with regard to excusals would be to require every potential juror who sought to be excused to make a written affidavit as to the reason why and to appear at a hearing so both sides have an opportunity to object. At the beginning of voir dire, defense counsel noticed that 49 of the 160 potential jurors had been struck from the jury list. When she expressed her concern about the missing potential jurors, the following colloquy took place:

> TRIAL COURT: Well, the ones that were not there, they were not able to serve. That's my information.
> DEFENSE COUNSEL: Did you determine them yourself, Your Honor, or is that something the Clerk did?
> TRIAL COURT: No. No. I haven't – I haven't – that's what I'm told.

Yates's counsel objected to the trial court's failure to comply with its own order. When Yates renewed his objection on this ground after the conclusion of voir dire, the trial court asked the clerk of the court if she had excused any jurors and she replied, "If they had a doctor's excuse." The trial court overruled Yates's objection by stating that they had a sufficient number of qualified jurors regardless of the procedure.

According to notations scribbled on the jury list created for this trial, the court clerk excused 18 potential jurors for medical reasons. Three others were apparently excused by the clerk for business reasons, such as being the sole proprietor of a gas station or needing to

attend scheduled employment training. The others removed from the list by the clerk were deceased, had moved out of the county, or were over 70 years old. The record contains only 14 written requests for a medical excusal from jury service, none written in affidavit form. Some are signed by doctors but often only state something like, "Please excuse _____ from jury duty due to health problems." The clerk never commented about the substance of any of these medical reasons, and when defense counsel attempted to elaborate on this objection, the trial court cut her off by stating, "I am through with that subject matter now."

In Georgia, there is no statutory exemption from jury duty for persons with medical problems. See OCGA § 15-12-1. However, the trial court or someone appointed in writing by the chief judge of the circuit may under OCGA § 15-12-1 (a) excuse a potential juror from jury duty if the juror shows "good cause why he or she should be exempt from jury duty[.]" Id.; *Thornton v. State*, 264 Ga. 563 (19) (449 SE2d 98) (1994). Thus, while a blanket, indiscriminate excusal of potential jurors who proffer medical excuses is incompatible with Georgia law and with the need to draw juries from a fair cross-section of the community, a trial court has the discretion to excuse a person based upon a determination that jury service would impose a "special and undue hardship" on that particular person due to a medical condition. See *Thornton*, supra; *McMichen v. State*, 265 Ga. 598 (33) (a) (458 SE2d 833) (1995). Since there was no inquiry into the nature of most of the medical excuses, no such determination of special and undue hardship was made. In fact, it appears from the record that every potential juror who offered a medical excuse was summarily removed from jury service. While a trial court has broad discretion in determining the validity of each request to be excused from jury service, *McClain v. State*, 267 Ga. 378 (1) (c) (477 SE2d 814) (1996), that discretion is abused when the trial court fails to make any inquiry into whether the proffered excuse constitutes "good cause." See OCGA § 15-12-1 (a); *Thornton*, supra; *McMichen*, supra. Because the record shows that a substantial number of potential jurors were released from jury service without such an inquiry, we conclude that the trial court erred and that this error affecting the composition of the array mandates a reversal of Yates's convictions and sentences. See *Thornton*, supra; *McMichen*, supra; *Holsey v. State*, 271 Ga. 856 (2) (524 SE2d 473) (1999). See also *Hendrick v. State*, 257 Ga. 17 (2) (354 SE2d 433) (1987) (a failure to comply with the essential and substantial provisions of OCGA § 15-12-1 can vitiate the array). Further, the record contains no written order authorizing the clerk to excuse potential jurors and providing guidelines for such excusals in accordance with OCGA § 15-12-1 (a). See *Hendrick*, supra; *Lumpkin v. State*, 255 Ga. 363 (1) (338 SE2d 431)

(1986), overruled on other grounds by *Woodard v. State*, 269 Ga. 317 (2) (496 SE2d 896) (1998). In fact, the trial court at the pretrial hearing specifically stated that the court clerk's authority to defer potential jurors did not extend to death penalty cases. Because the trial court's abuse of discretion prevented the presentation of a proper jury array, Yates must be retried. See id.

3. Yates claims that the trial court erred by refusing to charge the jury on voluntary manslaughter as a lesser-included offense of malice murder. Yates testified at trial that he was not living with the victim and was not in a relationship with her in April 1998, but spoke with her on April 9, 1998, and she wanted him back.[2] He said he saw her at the American Legion on April 12 and they agreed to meet after the dance to talk. They also had an argument about the way she was dancing. Yates testified that he left the club and went to a restaurant for a while and then convinced a friend to drop him off near Thompson's apartment so he could "get this thing straightened out with Kem." He climbed through Thompson's window after she did not answer his knock on the front door because he had a "suspicion" that she was with someone else. Although he said he was not planning to hurt anybody, he went to Thompson's bedroom door and heard "a moaning sound from a male" which made him "sick in the stomach[.]" He then kicked the door in and saw Ms. Thompson, fully dressed, "rising off" Crafter, who was undressed. He said Crafter then attacked him and he pulled the knife he carried for protection. In the ensuing struggle, according to Yates, all three people were "in one bunch and I'm just swinging [the knife] wildly." He heard Thompson say "I been cut" and the officer arrived while he was still fighting with Crafter. He said that he had no intention of hurting anybody when he kicked in the bedroom door. On cross-examination, he said he was not jealous and he reiterated that he accidentally stabbed Thompson ten times. On re-direct examination, he repeated that he was trying to defend himself from Crafter when he was swinging the knife. Yates requested that the trial court charge the jury on voluntary manslaughter, self-defense, and accident. The trial court charged on self-defense and accident, but refused to charge voluntary manslaughter.

We conclude that the trial court's refusal to charge voluntary manslaughter was not error. Voluntary manslaughter occurs when a defendant kills a person "under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient

---

[2] Although not revealed until the sentencing phase, Yates had been released from jail on March 30, 1998, after spending almost a year incarcerated.

to excite such passion in a reasonable person[.]" OCGA § 16-5-2 (a). See also *Worthem v. State*, 270 Ga. 469 (2) (509 SE2d 922) (1999). While jury charges on self-defense and voluntary manslaughter are not mutually exclusive (*Woody v. State*, 262 Ga. 327 (2) (418 SE2d 35) (1992)), the provocation necessary to support a charge of voluntary manslaughter is different from that which will support a claim of self-defense. *Worthem*, supra. "The distinguishing characteristic between the two claims is whether the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself. Only where this is shown will a charge on voluntary manslaughter be warranted." Id.

The evidence in this case showed that Yates initiated the conflict by climbing through a window into his ex-girlfriend's apartment at about 3:00 a.m. because he suspected she was with someone else, by listening at her bedroom door, and then by breaking down her bedroom door when he did not like what he heard. Yates specifically testified that he was not jealous, only "sick in the stomach,"and that he did not intend to hurt anybody when he broke down the door. A trial court is not required to give a charge on voluntary manslaughter when a defendant's own testimony shows unequivocally that he was not angered or impassioned when the killing occurred, and when the other evidence does not show otherwise. See *Worthem*, supra; *Saylors v. State*, 251 Ga. 735 (2) (309 SE2d 796) (1983). Since evidence of a sudden, violent, and irresistible passion resulting from serious provocation was lacking, a charge on voluntary manslaughter was not required.

4. Since Yates will be retried, we need not specifically discuss Yates's claim that the State exercised its peremptory strikes in a racially discriminatory manner. See *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). We remind the trial court, however, that a *Batson* motion is authorized without regard to whether the defendant and victim are of the same race. See *Powers v. Ohio*, 499 U. S. 400 (111 SC 1364, 113 LE2d 411) (1991).

5. There was no error involving the grand and traverse jury pools. See *Morrow v. State*, 272 Ga. 691 (1) (532 SE2d 78) (2000); Unified Appeal Procedure Rule II (C) (6). Forced balancing to ensure that the racial balance in a grand or traverse jury pool reflects the racial balance in the county population is not unconstitutional. *Gissendaner v. State*, 272 Ga. 704 (5) (532 SE2d 677) (2000).

6. In the sentencing phase, the State called a parole officer to testify about a phone call he received from the victim in August 1996. Yates objected that the substance of the call was hearsay, but the prosecutor stated that the call was admissible under the necessity exception because "she's not here, she's dead, she can't testify." The trial court overruled the objection, and the parole officer testified

that Ms. Thompson told him Yates had threatened her life.

The admission of this hearsay was error. "To satisfy the necessity exception to the hearsay rule, the proponent must show a necessity for the evidence and a circumstantial guaranty of the statement's trustworthiness." *Morrow*, 272 Ga. at 700 (9). See also *Clark v. State*, 271 Ga. 6 (5) (515 SE2d 155) (1999); *Perkins v. State*, 269 Ga. 791 (4) (505 SE2d 16) (1998). The hearsay declarant's death or unavailability is not by itself sufficient to satisfy the necessity part of the exception. *Clark*, supra. The hearsay proponent must also show " 'that the statement is relevant to a material fact and that the statement is more probative on that material fact than other evidence that may be procured and offered.' [Cit.]" Id. The State made no such showing in this case. Moreover, the parole officer's testimony after the trial court's ruling shows that the hearsay declarant's statement cannot be considered reliable or trustworthy. He testified that he was not Yates's assigned parole officer; he just happened to be the only one in the office when Ms. Thompson called. He was not aware whether she had called his office to report other incidents because he had no personal involvement with Yates's parole case other than dealing with that one phone call in August 1996. He had apparently never met Ms. Thompson nor spoken with her before or after that one call. He did not testify as to her demeanor or tone of voice over the phone. In addition, Ms. Thompson told him that Yates's alleged threats to her had also been made over the phone. The parole officer further said he advised her to take out a warrant on Yates, but she replied that she did not want to come to the office and no warrant was apparently ever taken. He admitted that office records show that Ms. Thompson later called the office to report that Yates had moved in with her. Because there was no showing of necessity or trustworthiness sufficient to satisfy the necessity exception, Ms. Thompson's phone conversation with the parole officer was inadmissible hearsay. See *Morrow*, supra; *Clark*, supra. We need not determine whether the admission of this hearsay was reversible error because the case is reversed on other grounds.

7. Evidence regarding execution by electrocution is not admissible as mitigating evidence in the sentencing phase of a death penalty trial. See *Barnes v. State*, 269 Ga. 345 (27) (496 SE2d 674) (1998).

8. There was no error with the sentencing phase jury charge. See *Jenkins v. State*, 269 Ga. 282, 295-296 (498 SE2d 502) (1998); *Ross v. State*, 254 Ga. 22 (6) (326 SE2d 194) (1985).

9. The Georgia statutes providing for the imposition of the death penalty are not unconstitutional. *Pruitt v. State*, 270 Ga. 745 (6) (514 SE2d 639) (1999).

10. The death qualification of prospective jurors is not unconsti-

tutional. Id. at 750 (10).

11. We need not address the remaining contentions because they are unlikely to recur on retrial. Because the evidence supports the jury's finding of a statutory aggravating circumstance, *Jackson v. Virginia*, supra, on retrial the State may again seek the death penalty. See *Childress v. State*, 266 Ga. 425 (6) (467 SE2d 865) (1996).

*Judgment reversed. All the Justices concur.*

DECIDED OCTOBER 1, 2001.

*Lindsey & Jacobs, Tamara Jacobs, English & Kemp, Arthur H. English IV, William A. Adams, Jr.*, for appellant.

*William T. McBroom III, District Attorney, Daniel A. Hiatt, Assistant District Attorney, Thurbert E. Baker, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paige R. Whitaker, Assistant Attorney General*, for appellee.