311 Ga. 524
FINAL COPY

S21A0298.  SINKFIELD v. THE STATE.

WARREN, Justice.

Charmon Sinkfield was convicted of malice murder and other

crimes in connection with the shooting death of Vernon Forrest.[1]  On

appeal, Sinkfield contends that the trial court erred when it denied

his pretrial challenge to Fulton County's master jury list and that

_____

[1] Forrest was killed on July 25, 2009.  After Sinkfield's first indictment was nolle prossed, a Fulton County grand jury re-indicted him on May 3, 2016, charging him with malice murder, felony murder predicated on aggravated assault, felony murder predicated on possession of a firearm by a convicted felon, felony murder predicated on armed robbery, aggravated assault with a deadly weapon, armed robbery, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon.  The State filed a notice of intent to seek the death penalty.  Sinkfield was tried in October 2016, and the jury found him guilty of all counts.  After the penalty phase of the trial, the jury recommended a sentence of life in prison without parole.  The trial court sentenced Sinkfield to life without parole for malice murder, a consecutive term of life without parole for armed robbery, and a consecutive five-year term for each firearm-possession offense.  The aggravated assault count merged, and the felony murder counts were vacated by operation of law. Sinkfield filed a timely motion for new trial on November 1, 2016, and he amended the motion on June 28, 2019.  After a hearing, the trial court denied the motion, as amended, on January 30, 2020.  Sinkfield timely appealed, and this case was docketed in this Court to the term beginning in December 2020 and orally argued on February 3, 2021.

the "death qualification" process resulted in a jury that violated his

fair cross-section rights under the Sixth Amendment to the United

States Constitution.[2]  Seeing no reversible error, we affirm.[3]

1.  Sinkfield contends that the master jury list from which his

grand and petit juries ultimately were selected was obtained in

violation of the Jury Composition Rule ("JCR").[4]  The JCR was

promulgated by this Court to effectuate the Jury Composition

Reform Act of 2011, Ga. L. 2011, p. 59, which was designed to replace

---

[2] "Death qualification" refers to a procedure in death penalty cases where potential jurors are questioned about their ability to consider the death penalty and the other sentencing options allowed by law.  See, e.g., *Brockman v. State*, 292 Ga. 707, 717 (739 SE2d 332) (2013) ("The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.") (citation and punctuation omitted).

[3] Sinkfield does not contest the sufficiency of the evidence, and neither of his claims on appeal require us to assess the strength of the evidence against him.  See *Davenport v. State*, 309 Ga. 385, 392 (846 SE2d 83) (2020).  We previously have affirmed the convictions of Sinkfield's accomplices.  See *Ware v. State*, 305 Ga. 457 (826 SE2d 56) (2019); *Crews v. State*, 300 Ga. 104 (793 SE2d 393) (2016).

[4] The JCR has been substantially amended since the time of Sinkfield's trial, so any citations to the JCR in this opinion refer to the version applicable in 2015, unless expressly stated otherwise.

the old "forced balancing" method of compiling jury lists with "a consistent methodology that produces lists of eligible jurors that are updated annually for each county and more accurately reflect each county's jury-eligible population." *Ricks v. State*, 301 Ga. 171, 173 (800 SE2d 307) (2017).[5] See also OCGA § 15-12-40.1. One key provision of the JCR stated that

> [e]ach county master jury list should be no less than 85% inclusive of the number of persons in the county population age 18 years or older as derived from the most recent decennial census or county population estimate (Table B01001 as of the date of this rule) from United States Census Bureau ("USCB") for the calendar year when the list is generated. . . .

JCR ¶ 3 (a). The JCR also set forth detailed procedures for the Council of Superior Court Clerks to "convert the information gathered about potential jurors into jury lists." *Ricks*, 301 Ga. at 174; JCR Appendix A. The result of these procedures was a

---

[5] Under the old "forced balancing" method, each county created its own jury list that included "men and women and certain identifiable racial groups in proportion to the county's population as determined by the most recent decennial census." *Ricks*, 301 Ga. at 173. In some counties with "fast-changing demographics," however, this approach left certain demographic proportions in jury lists "significantly out of line by the end of the decade." Id.

3

"'Statewide Master Jury List' and 'County Master Jury Lists' for all 159 counties." *Ricks*, 301 Ga. at 178. Because the new regime "gave centralized responsibility for preparing each county's master jury list to the Council of Superior Court Clerks," local county officials retained only limited authority to deactivate jurors from that list. Id. at 173; see JCR ¶ 6.

In pretrial motions challenging Fulton County's 2015 master jury list, Sinkfield contended that the county violated the JCR by improperly removing or inactivating thousands of jurors from the jury list. To that end, a defense expert testified that he calculated the jury list inclusivity at 83.58%. After a hearing, the trial court denied Sinkfield's motions, finding that Fulton County's master jury list complied with the JCR and was "no less than 85% inclusive." About a year after the trial court's order, however, we issued our decision in *Ricks*, in which we concluded — at the pretrial interim review stage — that Fulton County's 2013 and 2014 master jury lists were altered at the county level in "clear violation" of the JCR.

4

Specifically, in *Ricks*, we determined that Fulton County (1) improperly allowed its vendor "to add names from its so-called 'legacy data' to the county master jury lists provided by the Clerks Council," (2) improperly used "the county's 'legacy data' to remove tens of thousands of names that were locally flagged as ineligible for jury service in prior years," (3) improperly allowed the vendor to use its own process to identify and eliminate potential duplicate records, and (4) improperly allowed the vendor to use "automated address screening" to inactivate potential jurors with "undeliverable" addresses. *Ricks*, 301 Ga. at 189-192. As a remedy for these violations, we remanded the case and directed the trial court to ensure that the prospective jurors for the defendant's trial were drawn from a list that complied with the JCR and the relevant statutory provisions. See id. at 194. And given that the case came before us on interim review, we expressly declined to address the question of whether the types of JCR violations at issue "actually

would be deemed reversible or prejudicial error on appeal from a conviction." Id. at 194 n.22.[6]

On post-conviction appeal in this case, Sinkfield asserts that Fulton County mismanaged its 2015 master jury list in substantially the same manner, and using the same vendor, as the 2014 jury list at issue in *Ricks*. He therefore argues that the county's 2015 jury list continued to violate the JCR, leading to a master jury list that was less than 85% inclusive. Sinkfield contends that, because both his grand and petit juries were drawn from the non-compliant master jury list, this Court should reverse his convictions and quash his indictment (or at least grant him a new trial).

---

[6] Interim review proceedings are distinct from post-conviction appeals, and, unlike "interlocutory" appeals generally available under OCGA § 5-6-34 (b), "interim review" is available only in death penalty cases. See OCGA § 17-10-35.1 ("In cases in which the death penalty is sought, there may be a review of all pretrial proceedings by the Supreme Court upon a determination by the trial judge under Code Section 17-10-35.2 that such review is appropriate."); Unified Appeal Procedure ("UAP") (Uniform Superior Court Rule 34) (establishing rules for identification and review of potential legal issues arising in death penalty cases). See also UAP Rule I (A) (2) (stating that one of the purposes of the UAP is "[m]inimizing the occurrence of error and correcting as promptly as possible any error that nonetheless may occur"); *Ricks*, 301 Ga. at 194 n.22 (stating that the purpose of interim review is "to avoid even arguably reversible errors in death penalty trials").

Sinkfield's enumeration of error fails because even if Fulton County's 2015 master jury list violated the JCR (an issue we need not decide here), he has not shown that he is entitled to a reversal of his convictions. To begin, in most cases, we would reverse a conviction only upon some showing of harm — that is, some probability that the error affected the outcome of the trial proceedings. See, e.g., *Taylor v. State*, 306 Ga. 277, 283 (830 SE2d 90) (2019) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.") (citation and punctuation omitted). Here, the record does not show — and Sinkfield does not contend — that the alleged JCR violations had any effect on the outcome of his trial proceedings.

Because Sinkfield has not demonstrated harm, a reversal of his convictions would be warranted only if the violations at issue were akin to a "structural error" — that is, a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." See *Arizona v. Fulminante*, 499

U.S. 279, 310 (111 SCt 1246, 113 LE2d 302) (1991); *Berry v. State*, 282 Ga. 376, 378 (651 SE2d 1) (2007) (defining structural error in the same way).  See also *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (124 SCt 2333, 159 LE2d 157) (2004) ("It is only for certain structural errors undermining the fairness of a criminal proceeding as a whole that even preserved error requires reversal without regard to the mistake's effect on the proceeding. . . . Otherwise, relief for error is tied in some way to prejudicial effect.").

Structural errors usually are based on a violation of a constitutional right; a few examples include the failure to give a constitutionally acceptable jury instruction on the reasonable-doubt standard in a criminal case, *Sullivan v. Louisiana*, 508 U.S. 275, 281-282 (113 SCt 2078, 124 LE2d 182) (1993); the improper denial of a right to self-representation, see *Oliver v. State*, 305 Ga. 678, 680 (827 SE2d 639) (2019); and the denial of a right to a trial by jury absent a valid waiver, *Balbosa v. State*, 275 Ga. 574, 575 (571 SE2d 368) (2002).  See also *Weaver v. Massachusetts*, __ U.S. __ (137 SCt 1899, 1911-1912, 198 LE2d 420) (2017) ("This Court . . . has granted

8

automatic relief to defendants who prevailed on claims alleging race or gender discrimination in the selection of the petit jury . . . though the Court has yet to label those errors structural in express terms[.] The errors in those cases necessitated automatic reversal after they were preserved and then raised on direct appeal.") (citation omitted); *Neder v. United States*, 527 U.S. 1, 8 (119 SCt 1827, 144 LE2d 35) (1999) (describing the "very limited class of cases" where the United States Supreme Court has determined "an error to be 'structural,' and thus subject to automatic reversal") (citations and punctuation omitted) (citing cases).

Similarly, this Court has suggested — without expressly using the term "structural error" — that automatic reversal may be warranted where an "essential and substantial" provision of a jury selection *statute* has been violated, thereby causing a discernible impact on the composition of the grand or petit jury, at least where such a claim is properly preserved and raised on direct appeal. As we have observed recently,

9

> [i]n *every* case in which we have confronted a violation of a jury selection statute that impacted *who* was chosen for the array — that is, in every case in which there was good reason to doubt that a particular juror would have been selected for the array without the violation — we consistently have deemed it a violation of an "essential and substantial" provision of the statute and held that relief was warranted.

*State v. Towns*, 307 Ga. 351, 355 (834 SE2d 839) (2019) (emphasis in original) (affirming dismissal of the indictment where two grand jurors were chosen in violation of the randomness requirement in OCGA § 15-12-66.1). See also *Harper v. State*, 283 Ga. 102, 103-104 (657 SE2d 213) (2008) ("In this case . . . the defect was not in complying with the statutory directives governing *how* the jury commission should select grand jurors. Instead, the alleged defect was that someone never selected by the jury commission served. . . . Where th[e] role of the jury commission has been entirely circumvented by the service of a grand juror it never selected for service, there has been an 'essential and substantial' violation of the law.") (citation omitted; emphasis in original); *Pollard v. State*, 148 Ga. 447, 453-455 (96 SE 997) (1918) (reversing conviction due to a

violation of "essential and substantial" provisions of jury selection statutes). Cf. *Yates v. State*, 274 Ga. 312, 315-316 (553 SE2d 563) (2001) (reversing convictions where the trial court abused its discretion by excusing jurors without conducting a "good cause" inquiry under former version of OCGA § 15-12-1.1 (a) (1)); *Joyner v. State*, 251 Ga. 84, 85 (303 SE2d 106) (1983) (reversing convictions due to unauthorized excusal of prospective jurors in "plain violation" of the former version of OCGA § 15-12-1.1 (a) (1)); *Blevins v. State*, 220 Ga. 720, 726 (141 SE2d 426) (1965) (reversing conviction on the ground that the jury was not "drawn in open court" as required by statute).

Here, however, Sinkfield does not allege any constitutional infraction with regard to Fulton County's master jury list, let alone demonstrate a constitutional infraction that would rise to the level of structural error. See *Fulminante*, 499 U.S. at 310. Nor has he shown a violation of an "essential and substantial" provision of a jury selection *statute* — or a violation of any statute for that matter — that would warrant automatic reversal under our precedent. See

11

*Towns*, 307 Ga. at 354-355; *Yates*, 274 Ga. at 315-316. Indeed, the primary objective of the JCR — to ensure that each county master jury list is "no less than 85% inclusive" of the county's adult population — is a prophylactic measure that is not tied to any specific constitutional or statutory mandate.[7] And even if the JCR could be analogized to a jury selection statute, Sinkfield has not shown that the alleged JCR violations had any discernible impact on the grand jury that indicted him or the petit jury that tried him; he does not identify any impaneled grand or trial juror who would not have served absent the JCR violations at issue, or a potential juror who would have served but for such violations. See *Towns*, 307 Ga. at 355 (a violation of an "essential and substantial" provision of a jury selection statute occurs if the violation "affects the identity of the persons selected for the array from the universe of persons eligible to serve").

---

[7] Notably, the JCR does not impose a strict percentage requirement; instead, it prescribes additional steps to be taken if the inclusiveness percentage falls below 85%. See JCR ¶ 3 (b), (c); see also JCR ¶ 3 (b) (current version) ("The inclusiveness percentage may nevertheless be below the 85% threshold for certain counties.").

This is not to say that the JCR can be ignored with impunity; it is a rule of this Court that must be followed. Even so, Sinkfield has neither alleged nor demonstrated the type of error that would require an automatic reversal of his convictions, and because he has not shown any harm from the purported JCR violations, we affirm the trial court's denial of relief on this ground. See *Ellington v. State*, 292 Ga. 109, 120 (735 SE2d 736) (2012) (denying relief for an error premised on a violation of a jury composition provision in the UAP because "it is highly probable that the trial court's minor violation of [the UAP] did not contribute to the jury's guilty and sentencing verdicts"), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706 n.3 (820 SE2d 640) (2018). Cf. *State v. Lampl*, 296 Ga. 892, 897 (770 SE2d 629) (2015) (relief was not warranted due to a grand-jury-related error because the defendant "has established neither a violation of his constitutional rights nor a structural defect in the grand jury process"); *Edwards v. State*, 281

Ga. 108, 109 (636 SE2d 508) (2006) (relief was not warranted due to a violation of a jury composition provision of the UAP).[8]

2. Sinkfield next contends that the death-qualification process in his case violated the fair cross-section requirement of the Sixth Amendment to the United States Constitution because it resulted in a jury from which "African-American women were almost entirely excluded." Although Sinkfield concedes that the death-qualification process itself is permissible, he argues that it violated his fair cross-section rights because it "systematically and disproportionately excluded a cognizable group from the jury pool." For the reasons explained below, Sinkfield's claim fails.[9]

---

[8] In *Ricks*, we granted relief for JCR violations similar to the ones alleged in this case, but as mentioned above, *Ricks* came before us on interim review—a procedural posture distinct from a post-conviction appeal. On interim review, the question of harm figures less prominently in our analysis of whether to grant relief, given that the effect of the alleged errors can be determined only to a limited extent before trial and the pretrial correction of any such error lessens the risk of reversal on post-conviction appeal. See *Ricks*, 301 Ga. at 193-194 n.22 ("[T]he State's contention that any errors in the county's compliance with the [JCR] are harmless misses the point of interim review, which is to avoid even arguably reversible errors in death penalty trials.").

[9] The Attorney General argues that because Sinkfield "did not receive a death sentence, this enumeration of error is moot." We reject this argument

14

The United States Supreme Court has made clear that the Sixth Amendment fair cross-section requirement applies only to the *venire* from which a jury ultimately is chosen — not to the jury itself. See *Duren v. Missouri*, 439 U.S. 357, 364 (99 SCt 664, 58 LE2d 579) (1979) (to establish a prima facie violation of the fair-cross-section requirement, a defendant must show, among other things, that the "representation of [a distinctive] group *in venires from which juries are selected* is not fair and reasonable in relation to the number of such persons in the community") (emphasis supplied); *Lockhart v. McCree*, 476 U.S. 162, 173 (106 SCt 1758, 90 LE2d 137) (1986) ("We have never invoked the fair-cross-section principle . . . to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large."). This means that, although the jury venire must be representative of the community, the fair

because the jury subject to the death-qualification process was the same jury that tried and convicted Sinkfield, and if he were to prevail on his fair cross-section claim—which he does not here — he would be entitled to relief. See *Bell v. Raffensperger*, 311 Ga. 616, 618 (858 SE2d 48) (2021) ("An appeal becomes moot if the rights insisted upon could not be enforced by a judicial determination.") (citation and punctuation omitted).

15

cross-section requirement does not restrict procedures — like the death-qualification process — that are utilized in selecting a jury from a properly representative venire.  See *Holland v. Illinois*, 493 U.S. 474, 480 (110 SCt 803, 107 LE2d 905) (1990) (the "traditional understanding" underpinning the fair cross-section requirement "has never included the notion that, in the process of drawing the jury, th[e] initial representativeness [of the venire] cannot be diminished by allowing both the accused and the State to eliminate persons thought to be inclined against their interests").  See also *Willis*, 304 Ga. at 694-695 (rejecting a fair cross-section claim based on the death-qualification process).  Thus, even assuming (without deciding) Sinkfield's claim that the death-qualification process resulted in a "disparate impact" on the inclusion of "African-American women" on the petit jury, he has nonetheless failed to establish a violation of his fair cross-section rights under the United States Constitution.[10]

---

[10] Importantly, other constitutional safeguards exist to ensure that potential trial jurors are not purposefully excluded from service based on race.

*Judgment affirmed. All the Justices concur, except LaGrua, J., not participating.*

Decided May 17, 2020.

Murder. Fulton Superior Court. Before Judge Millender.

*Shayla J. Galloway, Christina P. Rudy, Christian G. Lamar,* for appellant.

*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.

---

See, e.g., *Batson v. Kentucky,* 476 U.S. 79, 100 (106 SCt 1712, 90 LE2d 69) (1986).  Sinkfield does not raise a *Batson* claim, however, and does not allege any purposeful racial discrimination in his jury-selection process.