NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 17, 2024

S24A0669. BROCK v. THE STATE.

COLVIN, Justice.

Appellant Wesley Brock appeals his convictions for malice murder and other crimes related to the shooting death of Ronald Williams.[1] On appeal, Appellant contends that the evidence

---

[1] Williams died on November 26, 2021. On February 9, 2022, a Paulding County grand jury charged Appellant with malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), possession of a firearm during the commission of a felony (Count 4), and concealing the death of another (Count 5).

At a jury trial held from August 8, 2022, through August 12, 2022, the jury found Appellant guilty on all charges. On August 12, 2022, the trial court sentenced Appellant to life in prison without the possibility of parole for malice murder (Count 1). The felony-murder count (Count 2) was vacated by operation of law. Though the trial court purported to merge the aggravated assault count (Count 3) into the felony murder count (Count 2), Count 3 actually merged into Count 1, because Count 2 had been vacated. See *Thompson v. State*, 318 Ga. 760, 761 n.1 (900 SE2d 607) (2024). The trial court also sentenced Appellant to five years in prison for the possession-of-a-firearm-during-the-commission-of-a-felony count (Count 4), to run consecutively to the malice-murder count, and ten years in prison for the concealing-the-death-of-another count (Count 5), to run consecutively to his other counts.

Appellant timely filed a motion for new trial, which he amended through

presented at trial was insufficient as a matter of constitutional due process to sustain his convictions and that the trial court erred by declining to grant a new trial based on the general grounds, as provided in OCGA §§ 5-5-20 and 5-5-21. Appellant also argues that the State violated his due process rights under the Fourteenth Amendment to the United States Constitution and Article I, Section I, Paragraph I of the Georgia Constitution by misstating the law on self-defense in its closing argument. And lastly, Appellant argues that the Paulding County Superior Court Clerk's Office used an out-of-date list to summon jurors for his trial, and that the use of this list violated the Paulding County Standing Order on Jury Management, Jury Composition Rule 6 ("JCR 6"), OCGA § 15-12-40.1,[2] and his right to an impartial jury and due process

_____

new counsel on August 23, 2023, and supplemented on August 24, 2023. Following a hearing on November 7, 2023, the trial court denied Appellant's amended motion for new trial, as supplemented, on November 10, 2023.

Appellant timely filed a notice of appeal to this Court on November 21, 2023. This appeal was docketed to this Court's April 2024 term and submitted for a decision on the briefs.

[2] While Appellant inconsistently cites both OCGA § 15-12-40 and OCGA § 15-12-40.1 in his brief, it is clear in context that Appellant is only arguing that OCGA § 15-12-40.1 was violated and not OCGA § 15-12-40. See OCGA

under the Sixth and Fourteenth Amendments to the United States Constitution. For the reasons explained below, we affirm.

1. The trial evidence showed the following. Williams lived in Gwinnett County with his cousin, Jackie Johnson. On November 26, 2021, he asked Johnson if she could drive him "way up [the interstate]." She declined but offered to let him borrow her car instead. He accepted and left home around 5:00 p.m. that evening. When Williams did not return home, Johnson filed a missing-persons report, and a BOLO ("be on the lookout") was issued.

On December 3, 2021, the Cobb County Police Department contacted Johnson to inform her that her car was found at an apartment complex located in Cobb County. After retrieving her car, she noticed a foul odor in the vehicle and possible blood stains in her trunk. She called the Gwinnett County Police Department (the "GCPD"), and an officer was sent to inspect the car. The officer impounded the vehicle so that it could be processed for evidence. The

§ 15-12-40 (providing that convicted felons and mentally incompetent persons are ineligible to serve as jurors).

crime scene technician who processed the vehicle also noted a "decomposition smell," a "slight chemical smell," and possible blood stains in the trunk. The stains tested positive for the presence of human blood and matched Williams's DNA profile.

Williams's phone records showed that on November 26 — the day after Thanksgiving — Williams's phone called Appellant's phone at 2:20 p.m., and Appellant's phone called Williams's phone twice at 5:30 p.m., with Williams's phone pinging off the cell tower near Williams's home in Gwinnett County during each of these calls. Then, around 7:00 p.m., the records showed that Williams's phone began pinging off a tower in Hiram, which is in Paulding County, and which was "consistent with . . . [what] [the GCPD] w[as] seeing from the license plate readers at the time" for Johnson's car. The last active communication Williams's phone had was with Appellant's phone at 7:31 p.m.

Cell-site location data showing Williams's phone leaving Gwinnett County and entering Paulding County was corroborated by security camera footage from a gas station near Appellant's home,

4

where Williams stopped for a few minutes. The footage, which was played for the jury, showed that Williams arrived at the gas station at about 7:30 p.m. in Johnson's Chevrolet Cruze. The footage also showed that a Toyota 4Runner arrived shortly thereafter and parked beside Johnson's car. The recording revealed that after a few minutes, the two vehicles left together by turning right out of the gas station.

On December 8, 2021, officers arrived at Appellant's house with a search warrant and interviewed him. An audio recording of the interview was admitted into evidence and played for the jury. In the interview, Appellant told officers five versions of his last encounter with Williams.

First, Appellant said that he last saw Williams before Thanksgiving, when he met Williams at the gas station to purchase cocaine. Appellant stated that he drove his Honda Civic, that he went home after the transaction, that Williams left traveling in the opposite direction, and that he did not know where Williams went thereafter.

5

After additional questioning during the same interview, Appellant offered a second version of events. He conceded that he drove his wife's Toyota 4Runner to meet Williams at the gas station, rather than his Honda Civic, and that he met Williams on November 26, 2021, rather than the week before Thanksgiving. Appellant stated that he and Williams then each drove from the gas station to a neighborhood under construction (the "neighborhood"), where, according to Appellant, they completed the deal and parted ways without issue.

Continued questioning yielded a third version of events. Appellant told officers that soon after he and Williams arrived in the neighborhood, Williams pulled a Glock on him and tried to rob him, that he was able to get the gun from Williams, that he told Williams never to contact him again, that Appellant then left, and that Appellant did not have any further knowledge about where Williams went thereafter or any knowledge about Williams's location.

Further conversation with law enforcement officers yielded yet a fourth variation of Appellant's recounting, during which Appellant

6

stated Williams tried to rob him as previously relayed, but that after Williams "fumbled" the gun, Appellant "grabbed it" from him and "immediately shot him" in self-defense. Appellant stated that he put Williams's body in the trunk of Johnson's car but he "d[idn't] know" if Williams was still alive when he did so. Appellant further admitted that he returned to the neighborhood several days later; that he drove Johnson's Chevrolet Cruze from the neighborhood to the apartment complex in Cobb County where it was later found; and that he left the car there with the keys inside and with Williams's body still in the trunk. Despite law enforcement officers telling Appellant that no body had been found in the trunk, Appellant repeated several times that Williams's body was in the trunk of the car when he abandoned it, and that if Williams was not in the car when it was found, then he did not know where Williams's body was. Appellant also told officers that the gun was inside his Honda Civic, which officers then retrieved, and that Williams had tried to rob him on two or three prior occasions.

Even after admitting that he shot Williams, Appellant's story

changed for a fifth time. Under continued questioning, Appellant conceded that he had given them only "90 percent" of the story, and he agreed to show them the location of Williams's body. Williams's body was soon located with Appellant's assistance in a wooded area behind a home in Dallas, Georgia. It had been covered with leaves and other natural debris.

Appellant's account of his disposal of Johnson's car was partially corroborated by security camera footage and witness testimony presented by the State at trial. Footage from the apartment complex where Appellant abandoned Johnson's car was admitted into evidence and played for the jury. It showed a black Chevrolet Cruze entering the apartment complex at 7:50 a.m. on the morning of December 1, 2021, and then the driver exiting the vehicle and leaving the apartment complex on foot. A law enforcement officer who reviewed the footage testified that "[he] immediately recognized [the driver] as [Appellant]."

Additionally, a coworker of Appellant's testified that on December 1, 2021, he and Appellant worked at a jobsite together in

Cobb County. The coworker said that Appellant was forty-five minutes late to work because his car allegedly broke down and that Appellant asked him to give him a ride to his car in Paulding County later that day. The coworker agreed and drove Appellant to the neighborhood, where Appellant's car was parked. The coworker testified that Appellant's car started without issue, even though Appellant claimed that his car could not start earlier in the day.

The State also presented evidence at trial regarding the gun used in Williams's killing. At trial, witness Andrew Wilson testified that in October 2021, he traded his Glock pistol for one of Appellant's firearms through a gun-trade website. Wilson identified Appellant at trial as the person with whom he traded. A law enforcement officer who testified at trial confirmed that the Glock handgun found in Appellant's Honda Civic was originally registered to Wilson.

Appellant testified at trial in his own defense. He stated that he bought drugs from Williams with some regularity. Appellant testified that Williams knew Appellant regularly bought, sold, and traded firearms, and in early October 2021, Williams contacted

9

Appellant, seeking to acquire a particular type of handgun. Appellant testified that he acquired the sought-after pistol by trading one of his own firearms with Wilson for a Glock. According to Appellant, Appellant then sold the Glock he acquired through this trade to Williams for $600. Separately, Appellant also testified that Williams had attempted to rob him on a prior occasion using a knife.

Appellant testified that on November 26, 2021, he arranged to meet with Williams to buy cocaine at a gas station in Paulding County, near Appellant's home. Upon seeing two police cars, Williams and Appellant decided to complete the deal elsewhere, and Appellant suggested they meet at the neighborhood. Appellant stated that the neighborhood was under construction at the time and that no one was living there.

Appellant testified that after entering the neighborhood, they parked and exited their vehicles and that Williams looked at him with "an angry face." Appellant said that Williams repeatedly asked him, "[w]here's the money," and then pulled a gun from the back of his pants and pointed it at Appellant. Appellant testified that this

10

was the gun he sold to Williams in October 2021. Appellant stated that "[Williams] took a couple steps towards [Appellant], turned his head, and that's when [Appellant] reached out and grabbed the gun, twisted it, pulled back[,] and took a couple steps back[.]"According to Appellant, Williams demanded Appellant give him the gun back and "lunge[d]" towards him. And as Williams lunged, Appellant shot him. According to Appellant, Williams fell back into one of the car doors, and when Appellant went to him, he was not breathing. Appellant testified that he thought Williams was going to kill him if he did not defend himself. Appellant said that he then opened the trunk of Williams's car, placed Williams's body in the trunk, and drove the car to the back of the neighborhood and parked it there. Appellant left the neighborhood in the 4Runner.

Appellant testified that a few days later he returned to the neighborhood to move Williams's body. Appellant drove Williams's car, with Williams's body still in the trunk, to another location, where he dumped Williams's body. Appellant said he then washed Williams's car at a car wash and drove it back to the neighborhood,

11

where he left it, and drove away in his Honda Civic. Appellant said that he drove in his Honda Civic the following day back to the neighborhood, got in Williams's car, drove it to an apartment complex in Cobb County, left it there, and then walked from the apartment complex to a nearby job site.

Appellant admitted at trial that he did not initially tell officers the entire truth during his interview. He testified that he admitted to shooting Williams only after officers pressed him on his story and accused him of lying. He stated that after being interviewed, he ultimately agreed to show officers the location of Williams's body.

On cross-examination, Appellant admitted that he agreed with the accuracy of the evidence presented against him except for the facts surrounding whether Appellant shot Williams in self-defense.

2. On appeal, Appellant contends that the evidence was insufficient as a matter of constitutional due process to support his convictions, and the trial court erred by denying Appellant's motion for new trial under OCGA §§ 5-5-20 and 5-5-21. While Appellant conflates his sufficiency and general-grounds claims in his brief, the

claims are "two distinct legal arguments with distinct legal standards." *Thompson v. State*, 318 Ga. at 764 (2) (citation and punctuation omitted). Accordingly, we address each claim separately and hold that both claims fail.

(a) When evaluating the sufficiency of the evidence as a matter of federal constitutional due process, we view the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Pritchett v. State*, 314 Ga. 767, 771 (1) (879 SE2d 436) (2022). When doing so, "we leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts, and we do not reweigh the evidence." Id. at 770 (1) (citation and punctuation omitted).

Viewed in the light most favorable to the verdicts, the evidence showed that Appellant admitted to shooting and killing Williams,

placing his body in the trunk of Johnson's car, hiding his body, washing Johnson's car to destroy evidence, and leaving Johnson's car at an apartment complex. Appellant did not inform law enforcement that he shot Williams until after officers discovered Appellant's potential involvement and questioned Appellant while executing a search warrant of his home. When speaking with law enforcement, he told multiple versions of what happened on November 26, 2021. And at trial, he stated for the first time that he sold the Glock handgun that killed Williams to Williams a few weeks before Williams was shot and killed with that very handgun.

This evidence was sufficient to authorize the jury to reject Appellant's self-defense theory and find that Appellant was guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Lopez v. State*, 318 Ga. 664, 668-669 (2) (898 SE2d 441) (2024) (holding that the evidence was sufficient to support defendant's malice-murder and possession-of-a-firearm convictions where defendant claimed self-defense and gave "shifting accounts" of how the shooting occurred); *Huff v. State*, 315 Ga. 558, 563 (1) (883 SE2d

14

773) (2023) (holding that the evidence was constitutionally sufficient to support defendant's convictions where defendant claimed self-defense and "[his] testimony at trial and his statements during his interview immediately after the shooting were inconsistent" and thus "a rational jury could have disbelieved [defendant]'s claim of self-defense based on his own trial testimony"); *Pritchett*, 314 Ga. at 771 (1) (rejecting defendant's contention that the State failed to disprove his self-defense argument where defendant "told conflicting stories [to the police] about what occurred, and these stories were also inconsistent with the physical evidence"). See also *Mims v. State*, 310 Ga. 853, 855 (854 SE2d 742) (2021) ("[T]he defendant's testimony, in which he claimed he was justified or provoked into acting, may itself be considered substantive evidence of guilt when disbelieved by the jury, as long as some corroborative evidence exists for the charged offense."). Thus, Appellant's constitutional sufficiency claim fails.

(b) Even when the evidence is legally sufficient to uphold a conviction, a trial judge may grant a new trial if the verdict of the

15

jury is "contrary to evidence and the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the evidence," OCGA § 5-5-21. See *Wilkerson v. State*, 307 Ga. 574, 574-575 (837 SE2d 300) (2019). When a defendant properly raises these grounds for new trial, commonly known as the "general grounds," the trial court exercises broad discretion to sit as the "thirteenth juror" and consider matters typically reserved to the jury, including conflicts in the evidence, witness credibility, and the weight of the evidence. *King v. State*, 316 Ga. 611, 616 (2) (889 SE2d 851) (2023). The trial court exercised this discretion in its order denying Appellant's motion for new trial and Appellant does not argue otherwise; instead, he merely argues that the trial court abused this discretion when denying his motion for new trial. But "[t]he merits of a trial court's discretion on the general grounds are not subject to our review—that decision is vested solely in the trial court." *Lee v. State*, 318 Ga. 412, 418 (3) (897 SE2d 856) (2024) (citation and punctuation omitted). Accordingly, Appellant's argument that the trial court erred in denying his motion for new

16

trial based on the general grounds presents us nothing to review.[3]

3. Appellant also contends that the State violated Appellant's due process rights under the Fourteenth Amendment to the United States Constitution and Article I, Section I, Paragraph I of the Georgia Constitution by misstating the law of self-defense during its closing argument.

In the State's closing arguments, the prosecutor stated:

> [T]he defense made a point about how I didn't tell you that you don't have to retreat. No, you absolutely do not have to retreat. You do not have to. You do not have to retreat in a situation where you are justified. *But you know what? You should.* [Appellant] had other things he could have done.

(Emphasis supplied). Defense counsel did not object to the statement during or after the State's closing argument.

Because defense counsel failed to object to the prosecutor's

---

[3] At times in the past, we have performed a *Jackson* sufficiency analysis in evaluating the general grounds. See, e.g., *Montgomery v. State*, 315 Ga. 467, 474 (3) (883 SE2d 351) (2023). While many of us "question whether it is proper for this Court to import *Jackson* into an appellate review of the general grounds," we need not resolve that question here because Appellant raised both claims, and because, as held in Division 2 (a), the evidence against Appellant was constitutionally sufficient to affirm his convictions. *King*, 317 Ga. at 616 n.8 (2).

allegedly improper statement in closing arguments at trial, this claim is not preserved for ordinary appellate review. See *Thompson*, 318 Ga. at 766 (3) (holding that the appellant's claim of error regarding the prosecutor's statement in closing was not preserved for appellate review because defense counsel failed to object). And plain error review does not apply to statements made in closing arguments for which no objection was made. See *Gates v. State*, 298 Ga. 324, 328-329 (4) (781 SE2d 772) (2016) (explaining that "alleged errors . . . based on improper remarks during closing arguments are not subject to review on appeal for plain error" where no objection was made). Appellant's claim therefore presents nothing for review.[4]

---

[4] As the cases cited by Appellant indicate, prosecutors "share the duty to ensure a fair trial," see e.g., *Sammons v. State*, 279 Ga. 386, 388 n.12 (2) (612 SE2d 785) (2005) (stating that prosecutors "may alert" the trial court of the need to pause the proceedings if the defendant is not present), and the trial court may respond sua sponte to alleged misstatements of law by the prosecution, see *Davis v. State*, 234 Ga. 730, 731 (2) (218 SE2d 20) (1975) (holding that the trial court did not err by denying an untimely motion for mistrial regarding the trial court's response to an alleged misstatement of the law by the prosecution to which no objection had been made). But Appellant cites no authority requiring reversal where there was no objection to a prosecutor's alleged misstatement of the law during closing arguments. That said, our conclusion that Appellant's claim presents nothing for our review should not be misunderstood as approval of the prosecutor's statement.

4. Lastly, Appellant argues that the Paulding County Superior Court Clerk's Office (the "Clerk's Office") improperly used the 2021 Master Jury List to summon jurors for his trial beginning August 8, 2022, rather than the 2022 Master Jury List. Appellant claims that this putative error violated the trial court's Standing Order on Jury Management, JCR 6, OCGA § 15-12-40.1, and his right to an impartial jury and due process under the Sixth and Fourteenth Amendments to the United States Constitution. For the reasons explained below, we disagree.

The composition, dissemination, and use of master jury lists is governed chiefly by OCGA § 15-12-40.1 and the JCR promulgated by this Court pursuant thereto. See *Ricks v. State*, 301 Ga. 171, 173-178 (1)-(2) (800 SE2d 307) (2017) (describing the Jury Composition Reform Act, Ga. L. 2011, p. 59, which includes OCGA § 15-12-40.1, and explaining the then-current version of the JCR); OCGA § 15-12-40.1 (i) (authorizing this Court to "establish, by rules, reasonable standards for the preparation, dissemination, and technological improvements of the state-wide master jury list and

19

county master jury lists"). As relevant here, OCGA § 15-12-40.1 requires the Council of Superior Court Clerks to compile a state-wide master jury list, and, from this list, to "disseminate . . . a county master list" to county clerks on July 1 of each year. OCGA § 15-12-40.1 (a), (d). The statute further specifies that the clerk in each county "shall choose a random list of persons from the county master jury list to comprise the venire." OCGA § 15-12-40.1 (h). JCR 6, in turn, governs the time by which annual county master lists must be used by county clerks. It states that

> [t]he Council [of Superior Court Clerks] shall certify new county master jury lists on July 1 of each year . . . . A new county master list shall be used by the clerk to summon jurors by the later of:
>
> > i. three months after list certification, or
> >
> > ii. the first summoning of jurors after list certification.

In addition to OCGA § 15-12-40.1 and the JCR, the Superior Court of Paulding County issued a Standing Order on Jury Management, dated August 11, 2017. The Standing Order provides, among other things, that the annual county master list issued by the Council of

20

Superior Court Clerks "shall constitute the jury list of [Paulding] County effective as of July 1 of each such year." The Standing Order further provides that the Clerk "shall be authorized" to mail juror summonses "at least 25 days prior" to the date such jurors are required to appear.

On August 8, 2023 — exactly one year after the start of Appellant's trial — the Clerk's Office discovered that it had never implemented the 2022 Master Jury List and that it had continued to summon jurors using the 2021 Master Jury List through the date of this discovery. News of this issue was spread quickly to the Public Defender's Office for the Paulding County Judicial Circuit, among others, and on August 24, 2023, Appellant filed a supplement to his amended motion for new trial, raising the claims at issue here. The trial court conducted an evidentiary hearing at which members of the Clerk's Office provided testimony regarding its use of the 2021 Master Jury List and their discovery of its failure to implement the 2022 Master Jury List. Based on the evidence presented, which was undisputed, the trial court denied Appellant's claims. In doing so, it

found that the Paulding County Clerk's Office used the 2021 Master Jury List when it mailed summonses to prospective jurors on or about July 5, 2022, for Appellant's August 8, 2022, trial. It further found that that the Clerk's Office failure to use the 2022 Master List for later trials "was unintentional and unknown to the Clerk's Office until on or about August 8, 2023," at which time it immediately notified the County Attorney and the Chief Judge of the Paulding County Judicial Circuit. The Chief Judge then notified the District Attorney's Office, who in turn informed the Public Defender's Office by written memorandum. Pursuant to a joint stipulation of the parties, the trial court found that each of the 40 prospective jurors on Appellant's panel was listed on both the 2021 and the 2022 Master Jury Lists. Based on these findings, the trial court concluded that the Clerk Office's use of the 2021 Master Jury List was proper under JCR 6 and that there was no prejudice to Appellant. It accordingly denied Appellant's claims. We review the trial court's factual findings for clear error and independently apply the law to the facts. See *Smith v. State*, 275 Ga. 715, 720 (4) (571 SE2d 740)

(2002) (citation and punctuation omitted).

Appellant argues that the Clerk's Office's use of the 2021 Master Jury List to summon jurors for his trial violated OCGA § 15-12-40.1 and JCR 6, but this claim fails. A violation of JCR 6 would have occurred only upon the continued use of the 2021 Jury Master List for summonses sent on or after October 1, 2022. See JCR 6 (providing, as relevant here, that the Council of Superior Court Clerks shall certify "new county master jury lists on July 1 of each year" and that county clerks are required to begin using the new county master jury lists no later than "three months after list certification," i.e., by October 1). But here, summonses were sent on July 5, 2022 — well before the deadline. While evidence adduced at the motion for new trial hearing showed that the Clerk's Office continued to summon potential jurors using the 2021 Jury Master List for other trials until August 2023, Appellant's trial was not among those that used the 2021 Jury Master List past the deadline set by the JCR. Further, Appellant's jurors were chosen from "a random list of persons from the [2021 Master Jury List]" as required

23

by OCGA § 15-12-40.1 (h). For these reasons, the Clerk's Office did not violate JCR 6 or OCGA § 15-12-40.1, and the trial court did not err by denying these claims.

Notwithstanding the Clerk's Office's compliance with JCR 6, Appellant argues that the Clerk's Office failed to comply with the Paulding County's own Standing Order, which requires the Clerk's Office to begin using new county jury lists on July 1 of each year. Because the Clerk's Office failed to do so, Appellant claims, he is entitled to a new trial. But while Appellant cites authority that a violation of OCGA § 15-12-40.1 or the JCR may require reversal, he cites no authority that a violation of a local standing order that is more restrictive than the JCR mandates any particular remedy.

Turning to his constitutional arguments, Appellant fails to show that the trial court's use of the 2021 Master Jury list in accordance with JCR 6 violated his rights to an impartial jury and due process under the Sixth and Fourteenth Amendments to the United States Constitution. While Appellant points to cases showing that he is entitled to a fair and impartial jury under the Sixth

Amendment to the United States Constitution as a general matter, he does not provide any authority suggesting he was entitled to the use of a particular jury list other than the one provided for by OCGA § 15-12-40.1 and JCR 6. And "[i]t is well settled that a defendant does not have a right to a particular juror but rather only has a right to a legal and impartial jury." *Saylor v. State*, 316 Ga. 225, 232-233 (3) (887 SE2d 329) (2023). Moreover, Appellant gives us no reason to believe that his jury was partial: each member of the jury was also on 2022 Jury Master List, and Appellant does not suggest that he would have objected to the same panel of jurors if drawn from that list. Appellant argues only that he could have received a different jury. While this is true, Appellant fails to provide any authority suggesting that he was entitled to such a jury, or that the trial court's use of the 2021 Master Jury List in accordance with the JCR violated the federal Constitution. As such, his claim fails.

*Judgment affirmed. All the Justices concur.*