**THIRD DIVISION**
**DOYLE, P. J.,**
**MARKLE and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten days**
**of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**January 27, 2026**

# In the Court of Appeals of Georgia

A25A1852. TRITT v. THE STATE.

PADGETT, Judge.

A jury found Edward Tritt guilty of four counts of aggravated child molestation and the trial court sentenced him to serve 40 years in confinement, followed by life on probation. Tritt appeals the denial of his motion for a new trial, as amended, arguing that an outdated jury array list was used to summon jurors for his trial which resulted in a violation of the Jury Composition Rule ("JCR") and that he received ineffective assistance of counsel in several respects. Tritt also complains

that the cumulative effect of errors that occurred during trial warrant reversal of his convictions. Finding no reversible error, we affirm Tritt's convictions.

"On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of innocence." *Petty v. State*, 375 Ga. App. 324, 324 (916 SE2d 151) (2025) (citation omitted). Viewed in that light, the evidence revealed that C. N. is a young boy who resided with his extended family. Tritt had known C. N. throughout the child's entire life. Tritt was friends with C. N.'s extended family, had temporarily resided with them, and spent time at the residence even after he no longer lived there.

In May 2019, C. N. revealed to his juvenile cousins that Tritt had inappropriate contact with him. The cousins told their grandmother about C. N.'s disclosure and the grandmother contacted law enforcement officials. C. N. revealed in a forensic interview that he had engaged in oral sexual activity with Tritt on at least two different occasions, once in the living room of C. N.'s residence and once in a wooded area of the property while he and Tritt were riding four-wheelers. C. N. testified at trial that he was approximately 12 years old when the sexual encounters with Tritt occurred. C. N. further testified that Tritt performed oral sodomy on him and that he performed oral sodomy on Tritt during each of the two incidents.

Following C. N.'s allegations being revealed, C. N.'s adult uncle, S. M., came forward and divulged that when he was 12 years old, Tritt performed oral sodomy on him during a time when S. M. lived in the same residence where C. N. now resided. S. M. testified that during the time he resided with his grandmother, Tritt would come around the residence almost daily. S. M. acknowledged that he subsequently quit school and lived with Tritt for approximately six months before moving away from Georgia. S. M.'s testimony was admitted at trial under OCGA § 24-4-414.

1. *Alleged violations of the JCR*

Effective July 1, 2011, the Council of Superior Court Clerks of Georgia ("Council") is required to compile a state-wide master jury list. OCGA § 15-12-40.1. From that state-wide list, the clerk of court for each county "shall obtain its county master jury list from the [C]ouncil." OCGA § 15-12-40.1(d). "On or after July 1, 2017, in each county the clerk shall choose a random list of persons from the county master jury list to comprise the venire." OCGA § 15-12-40.1(h). Trial juries must be chosen from the county master list. OCGA § 15-12-120.1. The statutory scheme which created the state-wide master jury list authorized our Supreme Court to establish rules and standards relating to the preparation, dissemination and technological improvements of the state-wide master jury list and the county master jury lists. OCGA § 15-12-40.1(i). Those rules are known as the JCR.

JCR 6 "governs the time by which annual county lists must be used by county clerks." *Brock v. State*, 319 Ga. 765, 773–74(4) (906 SE2d 739) (2024).  JCR 6 provides:

> the Council of Superior Court Clerks shall certify new county master jury lists on July 1 of each year. . . .  A new county master list shall be used by the clerk to summon jurors by the later of:
>
> i. three months after list certification, or
>
> ii. the first summoning of jurors after list certification.

*Brock*, 319 Ga. at 773–74(4) (citing JCR 6 (punctuation omitted)). Tritt's jury trial was conducted February 6 through 9, 2023.[1] In Paulding County, where Tritt's trial occurred, the clerk's regular practice is to download the county master list from the Council and have that list uploaded into the clerk's case management software on an annual basis. When preparing for a trial week, the jury clerk logs into the case management software and, after entering data relevant to that particular trial week, the software randomly selects potential jurors that make up the venire panel for that trial week. The list of potential jurors for that specific upcoming trial week is based

---

[1] Despite extensive testimony on this issue elicited during the hearings on Tritt's motion for new trial, the date upon which the venire panel for Tritt's trial were summoned was not established. The jury clerk testified that she generally issues jury summonses the month prior to the trial date.

4

upon the county master list that was previously uploaded into the case management software. Jury summonses are printed for mailing to the potential traverse jurors.

It is undisputed that the Clerk of Superior Court for Paulding County mistakenly failed to upload the 2022 county master jury list into its case management software. The clerk's office downloaded the 2022 county master list from the Council on July 1, 2022, but the list was inadvertently not uploaded into the clerk's case management software. The clerk learned of the problem on August 8, 2023, when the jury coordinator was attempting to draw jurors for a 2023 trial week and realized that the 2022 county master list was not uploaded into the case management software. The clerk's office reached out to the company that provides their case management software and, after investigation, the case management software company realized that the 2022 list was not uploaded into the case management software and the company reported those findings to the clerk. The clerk immediately reported the discovery to the chief judge of the Paulding Judicial Circuit and to the district attorney. See *Brock*, 319 Ga. at 774(4). The district attorney then prepared a memo that was shared with the circuit public defender and lawyers who represented clients in affected trials. The memo disclosed the issue and provided the district attorney's legal analysis of how the issue impacted cases that were tried during the relevant time period. In short, the venire panel from which the trial jury

5

was selected for Tritt's trial was chosen from the 2021 county master list but, according to the JCR, should have been chosen from the 2022 county master list.[2]

The clerk's office then performed a review and determined that all jurors who made up the venire in Tritt's trial appeared on both the 2021 county master list and the 2022 county master list. During the hearings on Tritt's motion for new trial, Tritt called an expert witness in jury statistics and composition. The expert witness testified that he compared the 2021 county master list with the 2022 county master list and determined that there were 15,525 people who appeared on the 2022 list that did not appear on the 2021 list. He testified that he reviewed the 200 potential jurors who were summoned for Tritt's trial and determined that some of the summoned jurors were on the 2021 county master list but were not on the 2022 list. However, the expert witness conceded that all of the potential jurors who appeared for voir dire in Tritt's case were on both the 2021 and 2022 lists. Neither the 2021 county master list nor the 2022 county master list provided sufficient demographic detail to allow for an analysis of whether any particular racial group would have significantly

---

[2] Much of the testimony concerning this issue was presented during the hearings on Tritt's motion for new trial. The testimony clearly established that the error was unintentional and was not realized until August 2023. The testimony also revealed that, upon discovery, the clerk immediately made the problem known, there was no attempt to disguise or hide the problem and there was no delay in disclosure.

changed had the 2022 list been used. He testified that had the 2022 list been used, there was a statistical guarantee that someone from the 15,525 people who appeared on the 2022 list but did not appear on the 2021 list would have been among those summoned for Tritt's trial. But he acknowledged that there was no way to determine whether any of those individuals would have appeared for voir dire, been disqualified, or requested a deferral from jury service on the week that Tritt was tried.

(a) *Waiver*

In their briefing, both parties have argued extensively as to whether Tritt waived his right to raise a violation of the JCR by failing to raise the issue prior to trial. Specifically, our Supreme Court has noted that Georgia "has long required a criminal defendant to raise a challenge to the jury lists at the time the jury is 'put upon him' or else he waives his right to object." *Hill v. State*, 310 Ga. 180, 185(2) (850 SE2d 110) (2020) (citation omitted). The JCR did not relax that general requirement. Id. Our Supreme Court addressed another case involving Paulding County's failure to use the 2022 county master list and after noting that the issue was first raised in the defendant's motion for new trial, went on to address the merits of the argument without addressing any alleged waiver by the defendant based upon his failure to raise the issue prior to trial. *Brock*, 319 Ga. at 773–76(4). Upon our

review of the record, we are persuaded that Tritt raised this issue in his motion for new trial and, in doing so, he did not waive his right to raise this issue on appeal. The trial court was able to receive testimony on the issue and rule, based upon that sworn testimony. We find that under these unique circumstances, Tritt did not waive his right to challenge the manner in which the venire panel was chosen in his trial.

(b) *Whether violation of the JCR mandates reversal*

In Tritt's case, it is clear that the 2022 county master list was not used to select the venire panel for his trial as mandated by the JCR. Yet, not all violations of the JCR mandate a reversal of the underlying conviction. When a violation of the JCR is established prior to trial, a defendant may be entitled to pretrial relief which requires that the JCR be followed, regardless of any showing of harm. *Moody v. State*, 316 Ga. 490, 513(5)(b) (888 SE2d 109) (2023). Where, as here, the matter is addressed after the trial has been completed, a different standard applies. Id.

A reversal based upon a violation of the JCR should occur upon a showing of harm that establishes "some probability that the error affected the outcome of the trial proceedings." *Sinkfield v. State*, 311 Ga. 524, 527(1) (858 SE2d 703) (2021). Here, there has been no showing that the JCR violation in this case had any effect on the outcome of Tritt's trial. In fact, Tritt does not allege harm in his briefing to this Court.

In the absence of a showing of harm, a reversal of Tritt's convictions would be warranted only if the violations amounted to a "structural error," which our Supreme Court has defined as a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Sinkfield*, 311 Ga. at 527(1) (citations omitted). Without expressly using the phrase "structural error," our Supreme Court has noted that automatic reversal may also be warranted where an "essential and substantial" provision of a jury selection *statute* has been violated as established by the evidence presented to the trial court. *Sinkfield*, 311 Ga. at 528(1). However, a mere violation of the JCR, which is not a statute, does not give rise to a finding of a "structural error" or a violation of an "essential and substantial" provision of the jury selection statute. Id. at 529(1).

Moreover, our Supreme Court has noted that there has never been an attempt "to articulate a standard that clearly marks the line between provisions of jury selection statutes that are 'essential and substantial' and those that are not." *Moody*, 316 Ga. at 513(5)(b) (citation omitted). In the absence of a clear definition of what provisions are deemed "essential and substantial," a primary but nonexclusive question should be whether the violation resulted in "the selection of a juror who likely would not otherwise have been chosen for the array." *Moody*, 316 Ga. at 513–14(5)(b) (emphasis omitted). Given that the evidence adduced in the trial court

9

established that all members of the venire panel who actually served in Tritt's case also appeared on the 2022 county master list, Tritt cannot make the prima facie showing that the violation of the JCR resulted in the inclusion of a potential juror who would not have been chosen for the array had the 2022 county master list been properly used to select the venire panel.

Notwithstanding, Tritt urges us to find that the holding in *State v. Towns*, 307 Ga. 351 (834 SE2d 839) (2019) demands reversal of his convictions. In *Towns*, the clerk identified two jurors who had been randomly selected to serve as petit jurors to serve as members of the grand jury when an insufficient number of potential grand jurors reported for service. *Towns*, 307 Ga. at 352(1). Following an evidentiary pretrial hearing, the trial court determined that the clerk selected those two individuals to serve based upon her personal knowledge of the two people, their availability, and in consideration of her ability to contact them quickly. Further, the court held that having those two individuals serve on the grand jury based upon the clerk's personal knowledge violated the randomness requirement associated with the selection of grand jurors. Id. In affirming the trial court, our Supreme Court held that where there is good reason to doubt that a particular juror would have been selected for the array without the violation, such a violation constitutes an "essential and substantive" provision which mandates relief. *Towns*, 307 Ga. at 355(3).

The alleged violation in Tritt's case is nothing like that presented in *Towns*. As noted in *Moody*, "[t]his case is more like the situations we noted in *Towns* that involved circumstances in which no relief was warranted." *Moody*, 316 Ga. at 514(5)(b). There was no evidence presented to suggest that the failure of the Paulding County clerk to use the 2022 county master list was intentional. There was no evidence that the clerk or anyone associated with the trial court had any knowledge that the 2022 county master list was not being used when the venire was selected to serve in Tritt's case. There was no evidence presented to suggest that any of the jurors who served on the venire panel would have not been a part of Tritt's venire panel had the 2022 county master list been properly used. All of the jurors who served on Tritt's venire panel were also among those individuals who appeared on the 2022 county master list and there is no way to discern whether the random selection from the 2022 county master list would have included or excluded any of the venire panel members who served on Tritt's panel. While there was evidence to suggest that the venire likely would have included some different individuals had the 2022 county master list been used to form the venire panel, it was impossible to say whether any of those individuals who served would or would not have been included on the panel. Additionally, all of the jurors who made up the venire panel for Tritt's trial would have been eligible to serve had the 2022 county master list been used.

"[T]he primary objective of the JCR — to ensure that each county master list is 'no less than 85% inclusive' of the county's adult population — is a prophylactic measure that is not tied to any specific constitutional or statutory mandate." *Sinkfield*, 311 Ga. at 529(1). Even if Tritt could analogize the JCR with a jury selection statute, he has failed to identify any impaneled trial juror who would not have served absent the JCR violations and has not identified any potential juror who would have served absent the violation. Id. "And it is well settled that a defendant does not have a right to a particular juror but rather only has a right to a legal and impartial jury." *Brock*, 319 Ga. at 775(4) (citation modified). Tritt has provided no evidence to suggest that the jury who decided his guilt was partial. See also *Willis v. State*, 304 Ga. 686, 707(11)(a) (820 SE2d 640) (2018) (not harmful error to decline to remove unqualified juror from the panel where the challenged juror did not serve on the twelve-person jury). Every member of the venire panel from which the trial jury was ultimately selected was also listed on the 2022 county master list. See *Brock*, 319 Ga. at 776(4). Tritt's argument is that he would have likely had a different venire had the 2022 county master list been utilized. "While that is true, Appellant fails to provide any authority suggesting that he was entitled to such a jury[.]" Id.

"This is not to say that the JCR can be ignored with impunity[.]" *Sinkfield*, 311 Ga. at 529(1). The JCR is a rule of the Supreme Court of Georgia and must be

followed. Id. However, establishing a violation of the JCR is only one part of the burden that falls upon Tritt in a post-trial assertion of reversible error based upon a violation of the JCR. Tritt remains obligated to establish the type of error that warrants an automatic reversal of his convictions or to show harm that stemmed from the violation of the JCR. Tritt has failed to do so, and we affirm the trial court's denial of relief on this ground.

2. Tritt also claims that he received ineffective assistance of counsel and, as a result, the trial court erred in denying his motion for new trial. Tritt claims that his trial counsel was ineffective in several different respects and we address those claims in turn.

To establish ineffective assistance of counsel, Tritt must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense to the extent that the outcome of the trial would have been different. *Strickland v. Washington*, 466 US 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance, and the reasonableness of counsel's conduct is viewed from the perspective known at the time of trial and under the unique circumstances of Tritt's case. *Roberts v. State*, 322 Ga. App. 659, 663(3) (745 SE2d 850) (2013). If Tritt fails to prove either prong of this familiar test, we are not

required to evaluate the remaining prong. *Smith v. State*, 373 Ga. App. 33, 45(b)(iii) (907 SE2d 327) (2024). "Importantly, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if 'they were so patently unreasonable that no competent attorney would have followed such a course.'" *Nembhard v. State*, 360 Ga. App. 568, 572(3) (859 SE2d 118) (2021) (citation omitted). "[J]udicial scrutiny of counsel's performance must be highly deferential. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Shields v. State*, 307 Ga. App. 830, 831(1)(a) (706 SE2d 187) (2011) (citation modified). Since this case calls for us to evaluate prejudice as part of an ineffective assistance of counsel claim, we review the record de novo, weighing "the evidence as we would expect reasonable jurors to have done so, as opposed to assuming that they took the most pro-guilt possible view of every bit of evidence in the case." *State v. Spratlin*, 305 Ga. 585, 595(2)(b) n.5 (826 SE2d 36) (2019) (citation omitted).

In reviewing a claim of ineffective assistance of trial counsel, we give deference to the trial court's factual findings and we will uphold those findings on appeal unless the factual findings prove to be clearly erroneous. However, we review the trial

court's legal conclusions de novo. *Mulkey v. State*, 366 Ga. App. 427, 438(4) (883 SE2d 173) (2023) "This burden — though not impossible to carry — is a heavy one." Id. at 437(4)(citation and punctuation omitted).

In this case, the trial judge had the venire panel broken down into groups of 12 potential jurors during voir dire. The trial court asked the statutory qualifying questions to each group of jurors and counsel for each party asked questions of the jurors. If any juror indicated that he or she wanted to answer a question outside the presence of the other jurors, that juror was brought back into the courtroom and each party was allowed to ask the juror additional questions. This process resulted in eight potential jurors being excused for cause. The State used seven of its nine preemptory challenges and Tritt used eight of his nine peremptory challenges.

(a) On appeal, Tritt claims that he received ineffective assistance of counsel when his trial counsel failed to move to strike Juror 32 for cause and failed to use a peremptory strike against Juror 32 and Juror 26. When asked the statutory qualifying questions, Juror 32 raised her hand when the trial court asked whether the jurors could be fair and impartial to both parties and the juror was brought back into the courtroom for separate questioning. When questioned, Juror 32 indicated that she had strong feelings about homosexuality based upon her religious beliefs. Because Tritt is homosexual, a fact which was raised during voir dire, he contends that trial

counsel should have moved to strike Juror 32 for cause. Tritt's argument also ignores the remainder of the exchange between the juror and counsel. Juror 32 made it clear that she had recently been involved in a car accident and she expressed far more concern about her physical ability to sit for extended periods of time than about her feelings on homosexuality. When asked specifically whether she could be fair to both parties, she responded in the affirmative. When asked if her mind was perfectly impartial between the parties, she unequivocally indicated that it was. When asked whether she had any bias or prejudice resting on her mind, either for or against the accused, she responded, "I don't guess so."

There was no basis for a challenge for cause against Juror 32. The mere fact that a juror points to an aspect of the case that makes him or her uncomfortable does not mandate that the juror be excused for cause. *Matiatos v. State*, 301 Ga. App. 573, 575(2)(a) (688 SE2d 385) (2009). Instead, as relevant here, a challenge for cause must be based upon a potential juror's inability to decide the case solely on the evidence and law put before him or her. Id. "An appellate court must pay deference to the finding of the trial court and this deference includes the trial court's resolution of any equivocations or conflicts in the prospective juror's responses on voir dire." *Adams v. State*, 283 Ga. 298, 299(2) (658 SE2d 627) (2008) (citation omitted). It is well settled that the failure of trial counsel to make a fruitless objection does not

16

constitute ineffective assistance of counsel. *Matiatos*, 301 Ga. App. at 575–76(2)(a). Because Tritt has failed to show that an effort to strike Juror 32 for cause would have been successful, trial counsel was not deficient for failing to make such a motion. *Barmore v. State*, 323 Ga. App. 377, 381(1) (746 SE2d 289) (2013).

Trial counsel was questioned extensively during the hearings on Tritt's motion for new trial. She has been admitted to practice law in Georgia for 16 years and has served as lead counsel in over 100 criminal jury trials. Trial counsel testified that, from her perspective, the jury pool in this case was "tough" but that she could not recall why she did not use a peremptory strike against Juror 32 or Juror 26. Nor could she recall why she only used eight of the allotted nine peremptory strikes. Trial counsel was not questioned about her motivation for using the peremptory strikes she did utilize and was not asked whether she was saving a strike to ensure a later juror was not on the jury.

As noted above, Juror 32 had strong feelings about homosexuality based upon her religious beliefs and the fact that Tritt was homosexual had come out in voir dire. Juror 26 expressed that she had an adopted son who had been molested but that the offender had never been charged and that she was "tick[ed] . . . off" by that fact. Juror 26 also noted that she had good interaction with the justice system when her child was involved with the juvenile court because he was "getting into trouble at

school." Juror 26 also noted that her son had received counseling at the child advocacy center, the same center where the forensic interview of C. N. was conducted in this case. When asked why she did not use a peremptory strike against Juror 26, trial counsel testified that she did not recall that Juror 26 had testified about her son being molested and being treated at the child advocacy center. Trial counsel did recall that there were numerous potential jurors who were victims of child molestation or had close friends or family members who were molested, but she could not recall why she did not strike Juror 26.

While trial counsel was unable to recall why she failed to use a peremptory strike against Jurors 32 and 26, she did indicate that if there was a juror who, through body language or other non-verbal clues she believed would not be a good juror from Tritt's perspective, she used a peremptory challenge against that juror. Additionally, trial counsel affirmatively testified that she used her allotted peremptory challenges in a manner that she believed was in Tritt's best interest.

"Which, and how many, prospective jurors to strike is a quintessential strategic decision." *Simpson v. State*, 298 Ga. 314, 318(4) (781 SE2d 762) (2016) (citation omitted). Trial counsel was unable to recall why she determined not to use a peremptory challenge against Jurors 32 or 26. We cannot say that, given the testimony of trial counsel and our review of the voir dire proceedings, that Tritt has

met his burden of establishing that no competent attorney would have struck the jury as his lawyer did. *Nembhard*, 360 Ga. App. at 573(3)(a). As trial counsel noted, the panel had numerous members who had been adversely affected by child molestation and there were other issues identified during voir dire which would suggest that certain jurors would not be best suited to sit on Tritt's trial.

Moreover, Tritt has failed to demonstrate a reasonable probability that the alleged deficient performance of trial counsel in striking the jury in the manner that she did changed the outcome of his trial. Tritt has not made any showing to suggest that the jurors at issue were not qualified to serve, harbored a prejudice against Tritt that they were not willing to set aside, or otherwise returned their verdict based upon something other than the evidence and law applicable to Tritt's case. *Simpson*, 298 Ga. at 319(4). Accordingly, even assuming deficient performance, reversal is not required because Tritt has failed to affirmatively show that he was prejudiced by his trial lawyer's failure to use a peremptory strike against either of the jurors at issue.

(b) Tritt next asserts that he received ineffective assistance of counsel by counsel's failure to object to testimony from C. N.'s grandmother concerning certain messages she discovered between C. N. and Tritt. During the trial, C. N.'s grandmother testified that she previously allowed C. N. to use her cell phone and in reviewing her phone, she noted direct messages between Tritt and C. N. via a social

19

media application. She testified that the messages were on a social media account maintained by C. N. "I want to say TikTok, but I don't think that was it. But I'm not sure." She was then asked to describe the content of the messages and she responded,

> I couldn't tell what he was really — I felt like he was coercing him into some situation. [C. N.] was asking for the credit card. [Tritt] was going to bring his four-wheeler. But he said something like are you still going to do that. But he never did say what, you know, so.

On cross-examination, Tritt's counsel asked whether the conversation that C. N.'s grandmother saw involved a sex act. The grandmother responded,

> Well, not necessarily a sex act. But I felt like he was being coerced the way the [sic] he was questioning my grandson. And my grandson was just wanting the four-wheeler and the credit card. He was going to give [C. N.] his credit card if he still was going to do that. That's all he said. But I don't know what that was.

Tritt alleges that the State failed to properly authenticate this alleged evidence and that trial counsel was ineffective for failing to object, based upon the lack of authentication and the best evidence rule.

At the motion for new trial, trial counsel was questioned about this testimony from C. N.'s grandmother. Trial counsel acknowledged that C. N.'s grandmother testified at trial that she had not shared with law enforcement her discovery of the messages on her phone but that, within the discovery documents turned over in

20

advance of trial, there were notes that the grandmother did actually tell law enforcement officers about the messages. On cross-examination, trial counsel acknowledged that according to the police report she received during discovery, the messages the grandmother found on her phone between Tritt and C. N. dealt with Tritt urging C. N. to take a shower and that masturbating was a normal thing for guys to do, all the while referring to C. N. as "little buddy." Further, trial counsel acknowledged that C. N.'s grandmother did not testify about these more concerning comments and that it would have been much more damaging to Tritt if the content of the messages as they appeared in the police reports came out at trial.

As Tritt correctly notes in his briefing to this Court, the mere fact that the testimony could have been worse does not govern our determination as to whether the testimony from C. N.'s grandmother should have been admitted in the first instance. When asked why she failed to object during trial, trial counsel testified that the testimony happened quickly and she was nervous but that she should have objected. Pretermitting whether trial counsel should have objected, the error was harmless as the testimony actually offered by the grandmother was relatively benign. *Johnson v. State*, 369 Ga. App. 414, 422(3) (893 SE2d 792) (2023). Therefore, Tritt cannot establish prejudice stemming from the admission of the testimony.

(c) Tritt next alleges that he received ineffective assistance of counsel when trial counsel failed to object to the admission of a series of Instagram messages that were allegedly sent by Tritt to C. N. When the messages were tendered, trial counsel voiced no objection. Tritt now claims that the messages "were of no evidentiary value," were irrelevant, and contained inadmissible character evidence. We disagree.

The messages that were admitted appear to be direct messages sent by Tritt via Instagram and they specifically name C. N. as the intended recipient. The lead investigator testified that these messages were located when they logged into C. N.'s Instagram account during their investigation. Tritt's profile includes his name and a description, indicating that he is a gay male, lives in Atlanta and wears diapers for medical reasons. The messages themselves appear to be Tritt reaching out to C. N. to say hello but there is no response from C. N. within the various messages. The messages span a short period of time and include the time period just before C. N. disclosed the molestation to his cousins.

Under OCGA § 24-4-401, evidence is relevant if it has "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence.' The standard for relevant evidence is a 'liberal one,' and such evidence is generally

admissible even if it has only slight probative value." *McClain v. State*, 303 Ga. 6, 10(3) (810 SE2d 77) (2018) (citation omitted). Evidence need not directly prove or disprove an element of the charged crime to be relevant. As to the alleged improper character references made in Tritt's profile, it is not a negative character reference to be gay or to wear a diaper for medical reasons. The fact that Tritt is homosexual was raised by Tritt during voir dire and was addressed again by trial counsel during opening statements. Tritt himself also testified about his need to wear adult diapers and noted that it was "[n]othing to be ashamed of."

Although trial counsel testified during the motion for new trial that she "missed" raising an objection to the Instagram messages, the record shows that she addressed the messages on cross-examination. In fact, trial counsel testified that part of her defense strategy was to note all of the things that law enforcement did not do to thoroughly investigate this case and she used the failure of law enforcement to request a search warrant for C. N.'s Instagram account to make her point. Trial counsel testified that her manner of questioning and cross-examining witnesses was strategic and that her questions were designed to establish that there was evidence that the officers did not adequately pursue during their investigation. "Whether to object during direct examination or instead rely on cross-examination 'falls within the ambit of reasonable trial strategy. Counsel's performance was not deficient in

23

this regard.'" *Faust v. State*, 302 Ga. 211, 219(4)(b) (805 SE2d 826) (2017) (citation omitted). Tritt's enumeration of error on this point is without merit.

(d) Tritt next complains that trial counsel was deficient in failing to object to a comment made by the investigating officer during the officer's testimony on cross-examination. Specifically, the investigator conceded that he did not attempt to subpoena social media records or obtain a search warrant for the defendant's cell phone during his investigation. Trial counsel then asked whether the officer thought that information would have been relevant. In response, the officer testified, "I attempted to speak to [Tritt] and he didn't want to speak to me." Later during the cross-examination of the same lead investigator, trial counsel asked the officer, "Okay. And last question: You never spoke with [Tritt] or got any warrants or anything to search any of his property or —" and the officer indicated that he had driven to Tritt's home in an attempt to talk to him about the incident.

Trial counsel did not object to the first reference made by the officer and immediately established via cross-examination that it was not uncommon for individuals to decline to speak to law enforcement officials in the course of police investigations. Trial counsel then returned to her line of questioning, noting that law enforcement officials did not seek to obtain the messages via subpoena or search warrant, which was a part of trial counsel's defense strategy. The officer's cross-

24

examination testimony ended with his final comment that was arguably responsive to the question he was asked by trial counsel.

The next day, the trial court addressed the issue outside the presence of the jury, and after reciting the exchange between the officer and trial counsel the day before, the trial court noted that the officer's response was objectionable. The trial court specifically advised the State to avoid that topic in closing arguments and asked trial counsel whether she wanted the court to instruct the jury to disregard the comment. Trial counsel responded by telling the trial judge that she did not want an instruction from the court to avoid additional attention being brought to the matter. Upon further consideration, trial counsel asked the trial court to address the issue in its charge to the jury. The trial court gave the specific instruction to the jury that was requested by trial counsel, telling the jury, "[t]he defendant is under no obligation to speak with law enforcement at any point."

The first comment made by the investigating officer was unresponsive and improper, but the comment was fleeting. *Watkins v. State*, 361 Ga. App. 55, 58(2) (862 SE2d 720) (2021). The second reference made by the officer about Tritt not wanting to speak with him was arguably responsive to the question asked of him by trial counsel. That second comment was also fleeting and the State did not attempt to address it further, either through the questioning of witnesses or via closing

25

argument. An improper comment that touches upon the defendant's right to remain silent does not necessarily require reversal. *Reid v. State*, 341 Ga. App. 604, 610(3) (802 SE2d 42) (2017). "Indeed, to warrant a reversal of a defendant's conviction, the evidence of the election to remain silent must point directly at the substance of the defendant's defense or otherwise substantially prejudice the defendant in the eyes of the jury." Id. at 611(3) (citation omitted). The trial court offered to make a curative instruction, which trial counsel declined in an attempt to avoid bringing additional attention to the comment. This decision was strategic and sensible under the facts of this case. Trial counsel's strategic decision to forego a curative instruction and, instead, to have the trial court charge the jury that the defendant has no obligation to speak with law enforcement is insufficient to support an ineffective assistance of counsel claim. *Rashad v. State*, 318 Ga. 199, 212(3)(d) (897 SE2d 760) (2024). "This strategic decision not to draw the jury's attention to the [improper comment] by declining a curative instruction was 'within the wide latitude of presumptively reasonable professional conduct engaged in by trial attorneys.'" *Brewer v. State*, 301 Ga. 819, 821(3) (804 SE2d 410) (2017) (citation modified). Tritt has failed to establish deficiency on this point.

(e) Tritt next complains that he received ineffective assistance of counsel in relation to a question posed by the jury and the response to that question. The jury

26

sent out a series of questions during their deliberations which included a request to rehear what the forensic interviewer said about C.N.'s truthfulness. It is well settled that a witness cannot opine upon the truthfulness of another witness as credibility is ultimately within the province of the jury to decide. *Weaver v. State*, 336 Ga. App. 206, 210(3)(b) (784 SE2d 61) (2016).

After reading the jury question into the record, the trial judge noted that the interviewer did not comment on C. N.'s truthfulness during her testimony and, had such testimony been elicited, it would have been objectionable. The prosecutor suggested that the trial court respond to the jury's question by telling them that they needed to rely upon their collective memory of the evidence and that the jury could request to rewatch the forensic interview if they wished. Trial counsel for Tritt agreed with the prosecutor's assessment and added a suggested response to the effect that the jury would not be provided a trial transcript. The trial court ultimately responded to the jury's question, stating, "The Court may not provide you a transcript. You must rely upon your collective memory."

Tritt mischaracterizes the trial court's initial comments after reading the jury's question as a proposed response. The trial court was merely reacting with the judge's understanding of the testimony and relevant law on the subject and the judge did not propose to respond to the jury's question with a comment on what had been

27

proven or not proven. To do so would have violated OCGA § 17-8-57. Instead, the trial judge turned to the lawyers for input which the judge used to formulate a written response to the jury's question. The ultimate response provided to the jury was a correct statement of law and Tritt did not receive ineffective assistance of counsel in this regard.

(f) Tritt next alleges that he received ineffective assistance of counsel when his trial counsel failed to "fully and properly" impeach S. M. during trial. When S. M. testified, he denied being in regular communication with Tritt via social media. S. M. indicated that Tritt occasionally reached out to him via social media messaging but that S. M. would only provide short, limited responses because he did not want to speak with Tritt.

On the morning of trial, Tritt provided his lawyer with multiple pages of communications between Tritt and S. M. via Facebook that appear to have been exchanged from April 2017 through June 2018. Those messages showed that while there were some occasions where S. M. provided limited responses to Tritt's communications, there were other, more extensive exchanges between S. M. and Tritt, including a few initiated by S. M. Tritt claims that he received ineffective assistance of counsel when trial counsel failed to introduce the messages for impeachment purposes, either through S. M. or Tritt.

28

However, trial counsel did have the messages with her when she cross-examined S. M. and when trial counsel began confronting S. M. with his responses to Tritt's messages on Facebook, S. M. said, "I mean, if that's what you got that's what you got. But I don't remember. I told you I did a lot of drugs." When asked about why she did not seek to admit the messages during trial, trial counsel acknowledged that there were messages that would have disputed S. M.'s testimony but several others that would have damaged Tritt. The majority of the messages were initiated by Tritt and included topics such as Tritt telling S. M. that he is a "gorgeous babe" and S. M. asking Tritt to stop "contacting him so much." In the final analysis, trial counsel made a strategic decision to not attempt to have the messages admitted into evidence because while they may have contradicted S. M.'s testimony, the messages also contained comments from Tritt that would have hurt Tritt's case.

In alleging ineffective assistance of counsel, Tritt bears the burden of showing that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Ryals v. State*, 321 Ga. 151, 156(1) (913 SE2d 604) (2025) (citation omitted). "[C]ounsel's decisions about trial tactics and strategy in particular may not form the basis of an ineffectiveness claim unless they were 'so patently unreasonable that no competent attorney would have followed such a course.'" *Warren v. State*, 314 Ga. 598, 602(2) (878 SE2d 438) (2022)

(citation omitted). Trial counsel testified that she made the strategic decision not to offer the Facebook messages between S. M. and Tritt into evidence and Tritt has failed to establish that trial counsel was deficient in this regard.

(g) Finally, Tritt alleges that his trial counsel was ineffective because she did not interview or call character witnesses at trial. Trial counsel testified that her communication with Tritt during the pendency of the case had broken down and that Tritt would not respond when counsel would reach out to discuss the case. Tritt worked as a long-haul truck driver and was not available to discuss the case with counsel in person in advance of trial. The Friday before trial was set to begin the following Monday, Tritt offered the names of a "couple of people . . . that he thought would be good character witnesses." Trial counsel reached out to at least one of those individuals whom trial counsel described as Tritt's roommate, and counsel left the conversation with the impression that the potential witness she spoke with would not be helpful.

Tritt testified that he identified four potential character witnesses to his trial counsel and two of those witnesses testified at the motion for new trial hearings. Those two witnesses testified that they were never contacted by trial counsel. However, trial counsel was never asked whether those two potential witnesses who testified at the motion for new trial hearings were ever identified to her by Tritt or

30

were among the people contacted by trial counsel prior to trial. The remaining two potential character witnesses were not called as witnesses, nor were affidavits presented as to their potential testimony. See *White v. State*, 365 Ga. App. 149, 153(2)(a) (877 SE2d 694 (2022). The failure of Tritt to tender a proffer from the witness or witnesses allegedly identified to trial counsel prior to trial makes it impossible to determine whether there is a reasonable probability that the result of the trial would have been different had that witness or those witnesses been called to testify. See id.

As to the two character witnesses who did testify at the motion for new trial hearing, the trial court concluded that one of them was the witness that trial counsel identified as Tritt's roommate and with whom trial counsel spoke with before trial. The trial court also determined that the testimony of the two character witnesses who testified at the motion for new trial hearings contradicted the trial testimony of Tritt.

> As a general rule, reasonable trial tactics and strategies do not amount to ineffective assistance of counsel. The decisions on which witnesses to call and all other strategies and tactical decisions are the exclusive province of the lawyer after consultation with his or her client. Whether an attorney's trial tactics were reasonable is a question of law, not fact. When assessing the reasonableness of counsel's actions, a court must evaluate counsel's performance from his or her perspective at the time of trial. This Court reviews a trial court's ruling on an

ineffective assistance claim on appeal by accepting the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.

*Hughley v. State*, 330 Ga. App. 786, 791(4) (769 SE2d 537) (2015) (citation omitted).

A lawyer cannot be deemed ineffective for failing to call witnesses whose existence was never brought to the lawyer's attention. *Howard v. State*, 310 Ga. App. 659, 664(3)(a) (714 SE2d 255) (2011). In general, the decision to call character witnesses falls within the wide latitude we afford lawyers in developing the best trial strategy or tactics to be employed during trial. See id. The record in this case makes it impossible to conclusively determine which potential character witness or witnesses were identified by Tritt prior to trial and which of those witnesses that trial counsel spoke with in advance of trial. It is within the trial court's discretion to resolve conflicting testimony between trial counsel and Tritt and to decide what evidence is credible and that which is not credible. *Young v. State*, 329 Ga. App. 70, 74(2) (763 SE2d 735) (2014). We cannot say that trial counsel's decision to forego calling the identified witnesses, when presented with the identity of the witnesses on the eve of trial, was deficient.

Even if the failure to call one or more of the character witnesses was deficient, we conclude that Tritt has failed to establish prejudice. "When considering the prejudicial effect of counsel's failure to call a witness, the court must consider

32

whether the testimony proffered would have had an effect on the trial's outcome."
*Collins v. State*, 300 Ga. App. 657, 660(3) (686 SE2d 305) (2009) (citation omitted).
The likelihood of a different result must be substantial, not merely conceivable.
*Johnston v. State*, 377 Ga. App. 1, 6(3) (921 SE2d 450) (2025). The trial court concluded that, with respect to the two potential character witnesses who testified at the motion for new trial hearing, trial counsel decided that the potential witness or witnesses that she did speak with prior to trial would not have been helpful and that a reasonable lawyer in trial counsel's position could have determined that calling those witnesses might prove harmful, in that their testimony seemed to potentially conflict with Tritt's trial testimony. Even if we were to assume deficiency, we do not find that Tritt has met his burden of establishing prejudice. This enumeration does not support reversal.

3. Tritt argues that the cumulative effect of the alleged errors in his trial warrant a new trial. "Georgia courts considering whether a criminal defendant is entitled to a new trial should consider collectively the prejudicial effect of trial court errors and any deficient performance by counsel — at least where those errors by the court and counsel involve evidentiary issues." *Harris v. State*, 358 Ga. App. 204, 211(7) (854 SE2d 374) (2021).

Our Supreme Court has held that "a defendant must show that the cumulative prejudice from any assumed deficiencies showed a reasonable probability that the results of the proceeding would have been different in the absence of the alleged deficiencies." *Waters v. State*, 317 Ga. 822, 832(4) (896 SE2d 507) (2023) (citation modified). For purposes of this analysis, we analyzed a number of alleged errors of trial counsel and the trial court relating to the selection of the jury from the 2021 county master list, the admission of the grandmother's testimony, and the investigating officer's unresponsive comments. We conclude that the collective effect of any presumed error is not sufficiently harmful to warrant a new trial. As we noted above, any of the alleged errors by trial counsel or the trial court had little, if any, prejudicial effect on the outcome of the trial. See *Smith v. State*, ___ Ga. ___(5) (___ SE2d ___) (2026), S25A1055, slip op. at 23-24 (Ga. Jan. 5. 2026); *Lee v. State*, 318 Ga. 412, 430–31(6)(h) (897 SE2d 856) (2024). Tritt has not shown that the cumulative prejudice from those assumed errors likely affected the outcome of his trial. Therefore, this claim fails.

*Judgment affirmed. Doyle, P. J., and Markle, J., concur.*